**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

**UNITED STATES OF AMERICA** and
**THE STATE OF COLORADO** *ex rels.*
Matthew Young, M.D., and Sue Perez,

Plaintiffs,

v.

**QWIKCAREMD, LLC**,
**FRONT RANGE URGENT CARE, PC**,
**COMFORT CARE FAMILY PRACTICE, PC**,
and **STEVEN L. WENRICH, M.D.**,

Defendants.

**DOCKET NO.________________**

**FILED UNDER SEAL**
**PURSUANT TO**
**31 U.S.C. § 3730(b)(2)**

**JURY TRIAL DEMANDED**

**<u>*QUI TAM* COMPLAINT AND DEMAND FOR JURY TRIAL</u>**

Plaintiffs and *qui tam* Relators Matthew Young, M.D., and Sue Perez, by and through their undersigned counsel, Brown, LLC, allege of personal knowledge as to their own observations and actions, and on information and belief as to all else, as follows:

## I.
## PRELIMINARY STATEMENT

1. This Complaint alleges fraud upon Medicare, Medicaid, Tricare, and other insurance programs funded and operated by the federal government and/or the State of Colorado (collectively, the "Government Insurance Programs").

2. Defendants sought and obtained reimbursement from Government Insurance Programs for patient care and services provided by nurse practitioners and other non-physician providers, as well as by non-credentialed physicians, as "incident to" the services of Defendant Steven L. Wenrich, M.D., even though the claims met none or virtually none of the criteria for such "incident to" billing.

3. This fraud allowed Defendants to claim reimbursement at 100% of the physicians' rate, instead of the lower rate that Defendants should have claimed for non-physician providers.

4. Relators bring this *qui tam* action on behalf of the United States under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, for fraud upon the United States.

5. Relators also bring this *qui tam* action on behalf of the State of Colorado under the Colorado Medicaid False Claims Act, Col. Rev. Stat. §§ 25.5-4-303.5 *et seq.* (the "State FCA"), for fraud upon Health First Colorado, the state's Medicaid program.

6. This Complaint has been filed *in camera* and under seal pursuant to 31 U.S.C. § 3730(b)(2). It will not be served on Defendant unless and until the Court so orders. A copy of the Complaint, along with written disclosure of substantially all material evidence and information that Relator possesses, has been served contemporaneously herewith on the Attorney General of the United States and the United States Attorney for the District of Colorado, pursuant to 31 U.S.C. § 3730(b)(2) and Fed. R. Civ. P. 4(d), and on the Attorney General of the State of Colorado, pursuant to Col. Rev. Stat. § 25.5-4-305(2)(b) and C.R.C.P. 4.

## II.
## JURISDICTION AND VENUE

7. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, because the complaint raises a federal question; and pursuant to 31 U.S.C. § 3732, because the action is brought under 31 U.S.C. § 3730 and Defendant transacts business in this District. This Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

8. This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a), because Defendant has at least "minimum contacts" with the United States, and can be found in and/or transacts business in this District.

9. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because at all times relevant to this Complaint, Defendant regularly conducted substantial business within this District and maintained employees in this District.

10. The Complaint has been filed within the time period prescribed by 31 U.S.C. § 3731(b).

## III.
## NO PUBLIC DISCLOSURE; DIRECT AND INDEPENDENT KNOWLEDGE OF THE VIOLATIONS ALLEGED HEREIN

11. Relators make the allegations in this Complaint based on their own knowledge, experience and observations.

12. There has been no public disclosure, relevant under 31 U.S.C. § 3730(e), of the allegations or transactions in this Complaint. Relators are the "original source" of the allegations in this Complaint even if any such public disclosure occurred. To the extent that there may have been a public disclosure under 31 U.S.C. § 3730(e)(4)(A), Relators possess information that is independent of and materially adds to any allegations that may have been publicly disclosed.

13. Relators voluntarily provided information about Defendants' violations to the United States and the State of Colorado before filing this action.

## IV.
## THE PARTIES

### A. Plaintiff the United States

14. Relators bring this action on behalf of Plaintiff the United States. At all times relevant to this Complaint, the United States has reimbursed Defendants for services provided to beneficiaries of Medicare, Medicaid, TRICARE, and other Government Insurance Programs. Thus, the United States has a cause of action on behalf of the Centers for Medicare and Medicaid

Services ("CMS"), the Defense Health Agency ("DHA"), and the other federal agencies that administer the Government Insurance Programs.

**B. Plaintiff the State of Colorado**

15. Relators also bring this action on behalf of Plaintiff the State of Colorado. At all times relevant to this Complaint, Colorado, through the Department of Health Care Policy and Financing ("DHCPF"), has reimbursed Defendants for the services provided to beneficiaries of Health First Colorado. Thus, Colorado has a cause of action on behalf of its agency DHCPF, which administers the Health First Colorado program.

**C. Relator Matthew Young, M.D.**

16. Relator Young is a citizen of the United States and during all times relevant herein was, and is now, a resident of El Paso County, Colorado.

17. Young is licensed as a physician by the State of Colorado.

18. From approximately March 30 through approximately August 7, 2020, Young worked for Defendants as a family physician.

**D. Relator Sue Perez**

19. Relator Perez is a citizen of the United States and during all times relevant herein was, and is now, a resident of El Paso County, Colorado.

20. Perez has worked for approximately 30 years as a medical biller.

21. From approximately late November of 2019 through approximately June of 2020, Perez worked as Defendants' Lead Biller. Perez worked at the QwikCareMD office on Stetson Hills Blvd., in Colorado Springs, but did the billing for H&P Institute, PLLC, d/b/a the Headache and Pain Institute, LLC, another practice owned by Defendant Wenrich.

## E. Defendant QwikCareMD, LLC

22. Defendant QwikCareMD, LLC is a limited-liability corporation organized and existing under the laws of the State of Colorado, with a principal office address of 5799 Stetson Hills Blvd., Suite 100, Colorado Springs, CO 80917.

23. QwikCareMD has four locations in Colorado: two in Colorado Springs, and one each in Pueblo and Fountain.

24. On its website, QwikCareMD purports to "provide[] fast, affordable, quality care without an appointment" and to offer[] "better, more attentive care than in an Emergency Room."[1]

## F. Defendant Front Range Urgent Care, PC

25. Defendant Front Range Urgent Care, PC ("Front Range") is a professional corporation organized and existing under the laws of the State of Colorado, with a principal office address of 5799 Stetson Hills Blvd., Suite 100, Colorado Springs, CO 80917 – the same as QwikCareMD.

26. A search on the website of the CMS National Plan & Provider Enumeration System[2] shows that a total of six National Provider Identifiers ("NPIs")[3] are associated with Front Range. Four of the NPIs are for urgent care practices at the same four locations listed on the QwikCareMD website; one is for an additional urgent care practice at 6530 S. Academy Blvd., Suite 105, in Colorado Springs; and one is for a durable medical equipment ("DME") business at the Stetson Hills Blvd. location.

---

[1] https://qwikcaremd.com/ (last accessed Aug. 6, 2020).

[2] *See* CMS NPPES NPI Registry, at https://tinyurl.com/Front-Range-NPIs (last accessed Aug. 9, 2020).

[3] "The National Provider Identifier (NPI) is the standard unique health identifier for health care providers and is assigned by the National Plan and Provider Enumeration System (NPPES). Medicare healthcare providers … must obtain an NPI prior to enrolling in Medicare…." Medicare Enrollment Application: Institutional Providers, CMS-855A, at 1 (*available at* https://www.cms.gov/medicare/cms-forms/cms-forms/downloads/cms855a.pdf) (last accessed July 28, 2020).

27. Relators Perez and Young – and, to their knowledge, all other employees of Defendants – received their paychecks from Front Range.

**G. Defendant Comfort Care Family Practice, PC**

28. Defendant Comfort Care Family Practice, PC ("Comfort Care") is a professional corporation organized and existing under the laws of the State of Colorado, with a principal office address of 5799 Stetson Hills Blvd., Suite 100, Colorado Springs, CO 80917 – the same location as QwikCareMD and Front Range.

29. The NPI 1396059184 and the Colorado Medicaid Provider Number 49109 are associated with Defendant Comfort Care at the Stetson Hills Blvd. location.

**H. Defendant Steven L. Wenrich, M.D.**

30. Defendant Wenrich is licensed by the State of Colorado as a doctor of obstetrics and gynecology. On information and belief, Wenrich and his wife Anita Wenrich (aka Anita Wiescamp) are the owners of Defendants QwikCareMD, Front Range, and Comfort Care.

31. On information and belief, Wenrich and his wife are also the owners of at least the following additional businesses:

a. H&P Institute, PLLC, doing business as the Headache and Pain Institute, LLC, with two locations in Texas;

b. the Women's Health Center, in Alamogordo, New Mexico; and

c. QwikClaimMD, a medical billing and practice-management company located in Quitman, Texas.

32. On information and belief, Wenrich and his wife have personal residences in at least Colorado and Texas.

33. The NPI 1154365302 and the Colorado Medicaid Provider Number 14656078 are associated with Defendant Wenrich.

### I. Interlocking Structure of the Corporate Defendants

34. Front Range, QuikCareMD and Comfort Care all share the same principal place of business: 5799 Stetson Hills Blvd., Suite 100, Colorado Springs, CO 80917.

35. On information and belief, all providers and other workers at any of the QuikCareMD locations are formally employed by Front Range.

36. In addition to their common ownership by the Wenrichs, the three nominal businesses all use the same space at each QwikCareMD location, with no physical or functional distinction or demarcation among them, and they share many of the same personnel.

37. The companies have one Practice Manager, who oversees the activities of all three nominal businesses at all locations. The Practice Manager reports directly to Defendant Wenrich.

38. During Relators' tenures, the Practice Manager was Donna Carrasco.

39. The companies also have one biller among them, with whom Relator Perez shared an office during her tenure. That person is responsible for all billing for QwikCareMD, Front Range, and Comfort Care.

## V.
## "INCIDENT TO" BILLING

40. Part B Medicare providers typically submit claims for reimbursement to the Government Insurance Programs using their own NPIs. However, under certain circumstances a non-credentialed physician, or non-physician provider ("NPP") such as a nurse practitioner, may bill Medicare for their services using the NPI of a credentialed supervising physician, under the "incident to" rule.

41. This rule enables a Medicare provider to bill for the services of these individuals at 100% of the physician's reimbursement rate for that service, whereas ordinarily the services would be reimbursed at only 85% of the physician's rate, or might not be reimburseable at all.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

42. In pertinent part, the "incident to" rule reads, "Medicare Part B pays for services and supplies incident to the service of a [Medicare-credentialed] physician (or other practitioner)," where the services or supplies are furnished "under the direct supervision of the physician (or other practitioner)," 42 C.F.R. § 410.26(b)(5), and where the incident-to provider is "an employee, leased employee, or independent contractor of the physician … or of the same entity that employs or contracts with the physician," *id.* § 410.26(a)(1).

43. The rule applies to "services or supplies [ ] furnished as an integral, although incidental, part of the physician's personal professional services in the course of diagnosis or treatment of an injury or illness." Medicare Benefit Policy Manual, CMS Publication No. 100-02, ("Benefit Manual"), Ch. 15[4] § 60.2

44. "Direct supervision" in this context "means the physician must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure[, but it] does not mean that the physician must be present in the room when the procedure is performed." 42 C.F.R. § 410.32(b)(3)(ii).

45. The supervising physician need not be the same individual upon whose professional service the incident-to service is based, *id.* § 410.26(b)(5). However, a credentialed physician must (1) have performed the initial evaluation and management ("E/M") service and established the diagnosis and plan of care for the problem now being treated on an incident-to basis, and (2) be actively involved in the ongoing care of the patient. *See* Benefit Manual, Ch. 15 § 60.1.B. ("[A] service or supply could be considered to be incident to when furnished during a course of treatment where the physician performs an initial service and subsequent services of a frequency which reflect his/her active participation in and management of the course of treatment.").

[4] *Available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c15.pdf (last accessed Aug. 18, 2020).

46. Similarly to Medicare, Colorado Medicaid regulations provide that, with certain exceptions not applicable here, "a non-physician provider may provide [Medicaid-]covered goods and services only under the Direct Supervision of an enrolled provider who has the authority to supervise those services." 10 Colo. Code Regs. § 2505-10 8.200.2.D.1. "Direct Supervision," in turn, means "the supervising provider shall be on-site during the rendering of services and immediately available to give assistance and direction throughout the performance of the service." *Id.* § 8.200.1.

47. A substantial percentage of Defendants' patients were beneficiaries of Government Insurance Programs.

## VI.
## <u>DEFENDANTS' FRAUD</u>

### A. Relator Young's Experience

48. From approximately March 30 through approximately August 7, 2020, Relator Young was employed by Defendant Front Range as a family physician.

49. Young worked primarily at two QwikCareMD locations in Colorado Springs: Garden of the Gods Road and Stetson Hills Blvd. He generally worked at the Garden of the Gods Road location Mondays through Wednesdays, and at the Stetson Hills Blvd. location Thursdays and Fridays.

50. All locations of QwikCareMD were (and are) open seven days a week.

51. During all or substantially all of his tenure with Defendants, Young was not credentialed to bill any insurance, including any Government Insurance Program. Instead, Defendants billed for the care that Young rendered, including care he rendered to beneficiaries of Government Insurance Programs, as "incident to" Defendant Wenrich's professional services.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

52. A substantial percentage of the patients Relator Young saw were beneficiaries of Government Insurance Programs.

53. During all or substantially all of his tenure with Defendants, Young was the only physician working at either Garden of the Gods Road or Stetson Hills Blvd. Thus, when he was working at one location there was no physician at the other location, and it is his understanding that during his days off there was no physician on duty at either location – even though both locations were open and seeing patients.

54. Relator Young worked in family practice, nominally through Comfort Care. Thus, all or substantially all of the patients who were seen in the urgent-care practice at Garden of the Gods Road or Stetson Hills Blvd. were seen by NPPs, generally nurse practitioners.

55. There were approximately 12-15 such NPPs working at QwikCareMD, across all locations, at any given time during Relators' tenures.

56. Defendants billed for the care rendered by these NPPs, including care they rendered to beneficiaries of Government Insurance Programs, as "incident to" Defendant Wenrich's professional services.

57. On information and belief, some non-credentialed physicians worked in urgent care at Defendants' other locations during Young's tenure, and their services were billed as "incident to" Defendant Wenrich's professional services.

58. During his tenure with Defendants, Relator Young rarely saw Defendant Wenrich, and then only during Wenrich's very brief visits to the locations where Young was working.

59. During his entire tenure with Defendants, Young never saw Wenrich seeing patients.

60. During Wenrich's rare, brief visits to the QwikCareMD offices, he spent all or substantially all of his time meeting with Practice Manager Carrasco.

61. During Young's entire tenure with Defendants, he never saw an indication in any patient's medical record that Wenrich had performed the initial E/M service, or established the diagnosis and plan of care, for that patient. In fact, during his tenure, Young never saw any notes in any medical record indicating that Wenrich had ever seen the patient.

**B. Relator Perez's Experience**

62. Relator Perez was Defendants' Lead Biller, even though she handled only the billing for HPI, Wenrich's pain practice in Texas. Perez worked at the QwikCareMD office on Stetson Hills Blvd., in Colorado Springs. She shared an office with the person who billed for the three corporate Defendants: QwikCareMD, Front Range, and Comfort Care. When Perez began working for Defendants, that other biller was Nelly Genet.

63. Perez was generally in the office five days per week, usually from about 8:30 a.m. until about 4:30 p.m.

64. During approximately the first half of Perez's tenure with Defendants, she saw Wenrich in the office no more than three times per month. During approximately the second half of her tenure, she saw Wenrich in the office approximately twice a week.

65. Each time Perez saw Wenrich in the office, it was only for a brief period. Perez never saw Wenrich see a patient; instead, she observed that he spent all or virtually all of these brief visits speaking with Practice Manager Carrasco in her office.

66. Relatively early in Perez's tenure, she was tasked with helping Ms. Genet credential practitioners for the various practices. She expressed to Genet her surprise that so many practitioners were not credentialed, even though Defendants had been billing for their services,

including billing Government Insurance Programs. In some cases, Defendants had been billing for the services of certain non-credentialed practitioners for many months.

67. When Perez asked Genet how this was possible, Genet told her that these services were billed "under Dr. Wenrich."

68. Perez told her that she believed the services did not meet the criteria for such billing. Genet acknowledged this, but said that the services of *all* Defendants' practitioners were billed under Wenrich's NPI, as "incident to" his services.

69. At some point shortly after this, Genet was terminated, or quit.

70. Perez later expressed to Practice Manager Carrasco her belief that such "incident to" billing was illegal. Carrasco told Perez words to the effect that Perez would be fired if she brought it up. The new biller – Genet's replacement – was in the office at that time and heard the conversation.

71. Relator Perez recalls numerous occasions when Carrasco, Wenrich, or even Wenrich's wife Anita gave instructions that all patient care was to be billed as "incident to" Defendant Wenrich's services.

72. Relator Perez knows, from working with and talking with Genet and her replacement, that Defendants billed all patient care as "incident to" Defendant Wenrich's services.

73. Perez also knows, from her tenure working for Defendants, that a substantial percentage of Defendants' patients were beneficiaries of Government Insurance Programs.

74. Each claim Defendants submitted to a Government Insurance Program that billed patient care as "incident to" Defendant Wenrich's services was a false claim "presented" within the meaning of the federal and/or the State False Claims Act, as further described below.

75. In submitting these false claims, Defendants made or used false records and statements material to those false and fraudulent claims, as further described below.

## VII.
## THE GOVERNMENT INSURANCE PROGRAMS

### A. Medicare

***Medicare: Program Overview and Provider Enrollment***

76. The Medicare program, Title XVIII of the Social Security Act, was enacted to pay for certain healthcare services provided to certain segments of the population. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 1395 *et seq*.

77. The federal Department of Health and Human Services, through the Centers for Medicare and Medicaid Services ("CMS"), administers the Medicare program.

78. Part B of the Medicare program pays for certain services and treatments provided in a "non-institutional" setting, such as the services and treatments Defendants here provide in their clinics.

79. CMS enters into agreements with providers such as Defendants to establish their eligibility to participate in the Medicare program. Participating providers in Medicare may seek reimbursement from CMS for services rendered to patients who are Medicare beneficiaries.

80. To enroll as an authorized participant in Medicare, a provider is required to make the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this contractor…. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions … and on the supplier's compliance with all applicable conditions of participation in Medicare.

Medicare Enrollment Application: Clinics/Group Practices and Certain Other Suppliers, CMS-855B, at 31.[5]

81. Compliance with applicable Medicare program rules and regulations is material to the government's decision to pay and its subsequent payment of claims. In order to be reimbursable by Medicare, services must be medically necessary, must actually be provided, and must be documented in a manner that allows CMS to determine if the services are properly payable.

***The Medicare Claims Process***

82. In order to receive reimbursement from Medicare, providers such as Defendants must submit a claim form. *See* Form CMS-1500.[6] That claim form requires the provider to make the following certification:

> In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete ... [and] 4) **this claim ... complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment …**

*Id.*, at 2 (emphasis added).

83. A provider may also submit the electronic equivalent of this claim form, which contains a substantially similar certification.

84. CMS guidance as to electronic claims submission is found in Chapter 24 of the Medicare Claims Processing Manual, CMS Publication No. 100-04 (the "Claims Manual").[7] Among other things, the guidance specifies the minimum content of the enrollment form that a local Medicare Administrative Contractor or "MAC"[8] may use to sign up providers to submit

[5] *Available at* https://www.cms.gov/medicare/cms-forms/cms-forms/downloads/cms855b.pdf (last accessed Aug. 7, 2020).
[6] *Available at* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms1500.pdf (last accessed Aug. 7, 2020).
[7] *Available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c24.pdf (last accessed Aug. 7, 2020).
[8] A MAC is a private insurer awarded a geographic jurisdiction to process medical claims for Medicare beneficiaries. MAC jurisdictions can be found at https://www.cms.gov/Medicare/Medicare-Contracting/Medicare-Administrative-

claims electronically. Per the Claims Manual, such an enrollment form must contain, and the enrolling provider must acknowledge, at least the following statements:

> The provider agrees to the following provisions for submitting Medicare claims electronically to CMS or to CMS' A/B MACs ….
>
> * * *
>
> 7. That it will submit claims that are accurate, complete, and truthful;
>
> * * *
>
> 12. That it will acknowledge that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsified or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law; [and]
>
> * * *
>
> 14. That it will research and correct claim discrepancies[.]

Claims Manual, Ch. 24 § 30.2.

85. The submission of such a certification, if false, is a violation of the FCA. 31 U.S.C. § 3729(a).

86. Each such false certification is a separate violation of the FCA.

## B. TRICARE

87. In 1967, the Department of Defense created the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), which is a federally funded medical program created by Congress. 10 U.S.C. § 1071. The CHAMPUS program covers active military personnel, retired personnel, and dependents of both active and retired personnel. *Id.*

88. In 1995, the Department of Defense established TRICARE, a managed healthcare program, which operates as a supplement to CHAMPUS. *See* 32 C.F.R. §§ 199.4, 199.17(a). Both programs are frequently referred to collectively as TRICARE/CHAMPUS, or just "TRICARE."

---

Contractors/Downloads/HHH-Jurisdiction-Map-Jun-2019.pdf (last accessed Aug. 7, 2020). The current A/B MAC for Colorado is Novitas Solutions, Inc.

89. The purpose of the TRICARE program is to improve healthcare services to beneficiaries by creating "managed care support contracts that include special arrangements with civilian sector health care providers." 32 C.F.R. § 199.17(a)(1). The Defense Health Agency ("DHA") oversees TRICARE.[9]

90. TRICARE health services are provided through both network and non-network participating providers. Providers who are Medicare-certified providers are considered TRICARE-authorized providers.

91. Claims for reimbursement from the TRICARE program are submitted using Form CMS-1500 or its electronic equivalent; thus, a provider seeking reimbursement from the TRICARE program makes the same or substantially the same certifications as set forth above in ¶¶ 82 and 84.

## C. Medicaid

***The Medicaid Program Generally***

92. Medicaid is a joint federal/state program that provides medical benefits to low-income and certain other needy residents of those states that decide to participate.

93. CMS administers the Medicaid program at the federal level. Within a broad legal framework, each state designs and administers its own Medicaid program. Each state prepares a plan that defines the operation of its Medicaid program, and that plan is then submitted for CMS approval.

[9] *See* http://www.health.mil/dha (last accessed Aug. 6, 2020).

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

94. The federal government provides some of the funding for approved state Medicaid programs, in accordance with Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq*.; thus, the benefits paid by individual state agencies contain a certain percentage of federal funds.[10]

***The Colorado Medicaid Program***

95. The Colorado Medicaid program is called Health First Colorado, and is administered by the DHCPF.

96. In order to participate in Health First Colorado, a provider must, *inter alia*, complete and submit a Provider Participation Agreement. As pertinent here, that agreement specifies that:

> A. Provider shall comply with all applicable provisions of the Social Security Act, as amended; federal or state laws, regulations, and guidelines; and Department rules….
>
> B. Provider shall accept full legal responsibility for all claims submitted under the Provider's Colorado Medical Assistance Program ID number to the Colorado Medical Assistance Program and shall comply with all federal and state civil and criminal statutes, regulations and rules relating to the delivery of benefits to eligible individuals and to the submission of claims for such benefits. Provider understands that noncompliance could result in no payment for services rendered.
>
> C. Provider shall request payment only for those services which are medically necessary … ***and rendered personally by the Provider or rendered by qualified personnel under the Provider's direct and personal supervision.*** Provider shall submit claims only for those benefits provided by health care personnel who meet the professional qualifications established by the State.

[10] Because Medicaid is partly funded by the federal government, the United States has a cause of action under the federal False Claims Act for false claims made to state Medicaid programs. *See, e.g., Hays v. Hoffman*, 325 F.3d 982, 988 (8th Cir. 2003) ("When Congress amended the FCA in 1986, it defined 'claim' to include requests for money made to grantees of the federal government. The legislative history explained this was done to clarify that false claims for FCA purposes include claims submitted to state agencies under the Medicaid program and other State, local, or private programs funded in part by the United States where there is significant Federal regulation and involvement.") (internal citation and quotation marks omitted; citing S. Rep. No. 99-345 at 22, 1986 U.S.C.C.A.N. at 5287); *Kane ex rel. United States v. Healthfirst, Inc*., 120 F. Supp. 3d 370, 396 (S.D.N.Y. 2015) ("Congress has repeatedly and specifically provided that claims submitted to Medicaid constitute false claims for the purposes of the FCA.") (citing, *inter alia*, S. Rep. No. 111-10, at 11, 2009 U.S.C.C.A.N. at 438, explaining that the 2009 Fraud Enforcement and Recovery Act clarified that "the FCA reaches all false claims submitted to State administered Medicaid programs.").

> Provider understands that any misrepresentation or falsification by another may result in fines and/or imprisonment under state or federal law.
>
> * * *
>
> K. Provider, and person signing the claim or submitting electronic claims on Provider's behalf, understands that failure to comply with any of the above in a true and accurate manner will result in any available administrative or criminal action available to the Department, the State Attorney General's Medicaid Fraud Control Unit, or other government agencies. The knowing submission of false claims or causing another to submit false claims may subject the persons responsible to criminal charges, civil penalties, and/or forfeitures.

Colorado DHCPF Provider Participation Agreement (emphasis added).[11]

97. In signing the agreement, the provider or its/his agent certifies as follows:

> I certify that I am fully authorized to execute this Agreement on behalf of Provider; and that I have read, understand, certify, and agree to all the statements made in all parts of this Provider Participation Agreement. I further understand that any false claims, statements, documents, or concealment of material fact … may be prosecuted under applicable federal and state laws.

*Id.*

98. Except in certain limited cases, Health First Colorado providers must submit claims electronically, via the program's Provider Web Portal. *See* General Provider Information Manual, *available at* https://www.colorado.gov/pacific/hcpf/gen-info-manual#papClaim (last accessed Aug. 7, 2020).

99. All claims submitted electronically to Health First Colorado "must contain a certification field to indicate that the sender verifies that submitted information is true and correct." Further, "[t]he enrolled provider is completely responsible for the claim information and the conditions under which claims are submitted." *Id.*, at https://www.colorado.gov/pacific/hcpf/gen-info-manual#claimcertstate (last accessed Aug. 7, 2020).

---

11 *Available at* https://www.colorado.gov/pacific/sites/default/files/Provider%20Participation%20Agreement.pdf (last accessed Aug. 9, 2020).

## VIII.
## THE FEDERAL AND STATE FALSE CLAIMS ACTS

100. As pertinent here, the federal FCA, 31 U.S.C. §§ 3729 *et seq.*, establishes liability for any "person" (natural or corporate) who:

a. "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(l)(A); or

b. "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(l)(B).

101. The FCA defines "knowingly" to include deliberate ignorance of or reckless disregard for the truth or falsity of information. *Id*. § 3729(b)(1).

102. The FCA defines a "claim" to include any request for money or property that:

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded….

*Id*. § 3729(b)(2)(A).

103. For each false claim or other FCA violation, the law provides for the assessment of treble damages, plus a civil penalty. *Id.* § 3729(a)(1)(G).[12]

[12] 31 U.S.C. § 3729(a)(1)(G) provides a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410). The Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. 2461 note, substituted a different statutory formula for calculating inflation adjustments on an annual basis. Following that formula, on June 19, 2020, the Department of Justice raised the penalty range to between $11,665 and $23,331. *See* 85 Fed. Reg. 37,004-10 (June 19, 2020).

104. The FCA also provides for payment of a percentage of the United States' recovery to the relator. *See id*. § 3730(d).

105. Similarly, the State FCA establishes treble damages liability for an individual or entity that:

a. "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," Colo. Rev. Stat. § 25.5-4-305(1)(a); [or]

b. "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, *id.* § 25.5-4-305(1)(b)[.]

106. "Knowing," within the meaning of the State FCA, is defined to include reckless disregard and deliberate ignorance. *Id.* § 25.5-4-304(3)(a)(II)-(III).

107. The State FCA provides for treble damages, the assessment of a civil penalty (equal to the civil penalty allowed under the federal FCA) for each violation or each false claim, and for payment to a relator of a percentage of the State's recovery. *Id.* §§ 25.5-4-305(1), 306(4).

**COUNT I:**
**FEDERAL FALSE CLAIMS ACT: PRESENTATION OF FALSE CLAIMS**
**31 U.S.C. § 3729(a)(l)(A)**

108. Relators repeat and re-allege the preceding paragraphs as if fully set forth herein.

109. As described *supra*, Defendants knowingly presented, or caused to be presented, to an officer, employee, or contractor of the United States, false and fraudulent claims for services and treatments provided to beneficiaries of the Government Insurance Programs. The claims were false and fraudulent because in making those claims, Defendants represented that the services were provided by Defendant Wenrich or "incident to" his services, when neither was the case.

110. By virtue of the false and fraudulent claims that Defendants presented or caused to be presented, the United States suffered damages in an amount to be determined at trial, and is entitled to treble the amount of those damages under the FCA, plus civil penalties of not less than $11,665 and up to $23,331 for each violation.

**COUNT II:**
**FEDERAL FALSE CLAIMS ACT: MAKING OR USING FALSE RECORD OR STATEMENT TO CAUSE FALSE CLAIM TO BE PAID**
**31 U.S.C. § 3729(a)(l)(B)**

111. Relators repeat and re-allege the preceding paragraphs as if fully set forth herein.

112. As described *supra*, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims for payment from the United States.

113. By virtue of these false or fraudulent records and statements, the United States suffered damages in an amount to be determined at trial, and is entitled to treble the amount of those damages under the FCA, plus civil penalties of not less than $11,665 and up to $23,331 for each violation.

**COUNT III:**
**COLORADO MEDICAID FALSE CLAIMS ACT:**
**PRESENTATION OF FALSE CLAIMS**
**Colo. Rev. Stat. § 25.5-4-305(1)(a)**

114. Relators repeat and re-allege the preceding paragraphs as if fully set forth herein.

115. As described *supra*, Defendants knowingly presented, or caused to be presented, to the State of Colorado false and fraudulent claims for care provided to beneficiaries of Health First Colorado. The claims were false and fraudulent because in making those claims, Defendants represented that the services were provided by Defendant Wenrich or "incident to" his services, when neither was the case.

116. By virtue of the false and fraudulent claims that Defendants presented or caused to be presented, Colorado suffered damages in an amount to be determined at trial, and is entitled to treble the amount of those damages under the State FCA, plus civil penalties of not less than $11,665 and up to $23,331 for each violation.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**COUNT IV:**
**COLORADO MEDICAID FALSE CLAIMS ACT: MAKING OR USING FALSE RECORD OR STATEMENT TO CAUSE FALSE CLAIM TO BE PAID**
**Colo. Rev. Stat. § 25.5-4-305(1)(b)**

117. Relators repeat and re-allege the preceding paragraphs as if fully set forth herein.

118. As described *supra*, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims for payment from the State of Colorado.

119. By virtue of these false or fraudulent records and statements, Colorado suffered damages in an amount to be determined at trial, and is entitled to treble the amount of those damages under the State FCA, plus civil penalties of not less than $11,665 and up to $23,331 for each violation.

**PRAYER FOR RELIEF**

**WHEREFORE**, Relators respectfully requests that this Court enter judgment in their favor and that of the United States and the State of Colorado, granting the following against Defendants:

(A) An Order requiring Defendants to immediately cease and desist from the conduct described herein and all similar conduct;

(B) On Counts I and II (violations of 31 U.S.C. §§ 3729(a)(l)(A) and (B), respectively), an Order requiring Defendants to pay to the United States treble its damages as determined at trial, plus a penalty in the maximum allowable amount for each false claim submitted in violation of the FCA, plus an award to Relators in the maximum amount permitted under 31 U.S.C. § 3730(d), as well as reasonable attorneys' fees, costs, and expenses incurred by the United States and Relators in prosecuting this action;

(C) On Counts III and IV (violations of Colo. Rev. Stat. § 25.5-4-305(1)(a) and (b), respectively), an Order requiring Defendants to pay to the State of Colorado treble its damages as determined at trial, plus a penalty in the maximum allowable amount for each false claim submitted in violation of the State FCA, plus an award to Relators in the maximum amount permitted under Colo. Rev. Stat. § 25.5-4-306(4), as well as reasonable attorneys' fees, costs, and expenses incurred by Colorado and Relators in prosecuting this action;

(D) On all counts, awards to the United States, Colorado, and Relators for pre- and post-judgment interest at the rates permitted by law; and

(F) Such other and further relief as this Court may deem to be just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Relators demand trial by jury on all questions of fact raised by the Complaint.

Dated: August 20, 2020

Respectfully submitted,

**BROWN, LLC**

*/s/ Patrick S. Almonrode*
Patrick S. Almonrode (admitted Aug. 25, 2016)
Jason T. Brown (admitted July 23, 2013)
Benjamin Lin
Terence Park
111 Town Square Place, Suite 400
Jersey City, NJ 07310
(877) 561-0000 (office)
(855) 582-5297 (fax)
*patalmonrode@jtblawgroup.com*
*jtb@jtblawgroup.com*
*ben.lin@jtblawgroup.com*
*terence.park@jtblawgroup.com*

*Attorneys for Relators*
*Matthew Young, M.D. and*
*Sue Perez*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 21, 2020, I caused a true copy of the Complaint in the matter captioned *United States of America and Colorado ex rels. Young and Perez v. QwikCareMD, et al.*, to be served upon the following, along with written disclosure of substantially all material evidence and information possessed by Relator:

AUSA Kevin Traskos, Civil Chief
*Kevin.Traskos@usdoj.gov*
AUSA Marcy Cook, Deputy Civil Chief
*Marcy.Cook@usdoj.gov*
Office of the United States Attorney
for the District of Colorado
1801 California Street, Suite 1600
Denver, Colorado 80202

Asst. Attorney General George Codding
*George.Codding@COAG.gov*
Office of the Attorney General
of the State of Colorado
Medicaid Fraud Control Unit
Colorado Department of Law
Ralph L. Carr Judicial Building
1300 Broadway, 9th Floor
Denver, Colorado 80203

Office of the Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
*Civilfrauds.quitams@usdoj.gov*

*/s/ Patrick S. Almonrode*
Patrick S. Almonrode